IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:19-CV-11-D

MICHAEL ZITO, and               )
CATHERINE ZITO,                 )
                                )
                Plaintiffs,     )
                                )
        v.                      )        **ORDER**
                                )
NORTH CAROLINA COASTAL          )
RESOURCES COMMISSION,           )
                                )
                Defendant.      )

On March 6, 2019, Michael and Catherine Zito ("the Zitos," or "plaintiffs") filed a complaint

against the North Carolina Coastal Resources Commission ("the Commission") alleging a taking of

private property without just compensation in violation of the Fifth Amendment of the United States

Constitution. See Compl. [D.E. 1] ¶¶ 63–78.[1] The Zitos seek declaratory relief, damages, just

compensation, reasonable attorney fees and costs, and all other appropriate relief. See id. at 13. On

August 9, 2019, the North Carolina Coastal Federation ("the Federation") moved to intervene as a

matter of right under Federal Rule of Civil Procedure 24(a)(2), or alternatively, by permission under

Federal Rule of Civil Procedure 24(b) [D.E. 24]. On August 20, 2019, the Commission moved to

dismiss the complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure

12(b)(1) [D.E. 36]. On that same date, the Commission amended its initial answer to the complaint

[D.E. 39]. On August 27, 2019, the Zitos opposed the Federation's motion to intervene [D.E. 40].

On September 5, 2019, the Federation replied [D.E. 41]. On September 6, 2019, the Zitos responded

---

[1] On June 5, 2016, the Zitos waived count one of their complaint, which alleged an "inverse
condemnation" takings claim under the North Carolina Constitution. See [D.E. 16] 1 n.1; cf. Compl.
¶¶ 48–62.

to the Commission's motion to dismiss [D.E. 42]. On September 20, 2019, the Commission replied [D.E. 44]. On September 25, 2019, the Zitos moved to clarify the status of the stipulated administrative facts [D.E. 45]. On October 16, 2019, the Commission responded [D.E. 49]. On October 24, 2019, the Zitos replied [D.E. 50].

As explained below, Hutto v. South Carolina Retirement System, 773 F.3d 536, 542–43 (4th Cir. 2014), requires this court to hold that the Eleventh Amendment bars the Zitos' Fifth Amendment takings claim. If the Zitos are to obtain relief on this claim, they first must get such relief from the United States Court of Appeals for the Fourth Circuit sitting en banc or from the United States Supreme Court. Thus, the court grants the Commission's motion to dismiss [D.E. 36] and dismisses the complaint without prejudice for lack of subject-matter jurisdiction. The court denies as moot the Federation's motion to intervene [D.E. 24] and the Zitos' motion to clarify the status of the stipulated administrative facts [D.E. 46].

I.

The Zitos are residents of Timonium, Maryland and own a beachfront lot at 10224 East Seagull Drive in South Nags Head, North Carolina ("the property"). See id. at ¶¶ 11–12. The Zitos bought the beachfront lot in 2008 for $438,500 and the lot contained a 1,700 square foot home built in 1982. See id. at ¶¶ 12–13. On October 10, 2016, a fire destroyed the Zitos' home on the property. See id. at ¶ 18. On July 31, 2017, the Zitos sought to rebuild their home, with a total floor area of 1,792 on a 32' x 28' footprint, and submitted a North Carolina Coastal Area Management Act ("CAMA") Minor Permit application to the Town of Nags Head's CAMA Local Permit Officer ("LPO") See id. at ¶¶ 20, 26–27.

CAMA governs development of North Carolina's ocean areas and establishes various rules and regulations. See id. at ¶¶ 20–22. These rules and regulations include set-back requirements for

ocean-front development on property within the Ocean Erodible Area of Environmental Concern ("AEC") that are based on a combination of annual erosion rates, the location of the first stable, natural vegetation line, and the size of the building. See id. at ¶¶ 20–24; 15A N.C. Admin. Code 7H.0304. Buildings of less than 5,000 square feet have a set-back line from the first stable line of vegetation of at least 30 times the annual erosion rate. See Compl. at ¶ 23; 15A N.C. Admin. Code 7H.0306(5)(a). Buildings of less than 2,000 square feet built before June 1, 1979, fall under a grandfather provision that establishes a reduced set-back line of 60 feet from the line of vegetation, if the standard set-back line would otherwise prevent building. See Compl. at ¶ 24; 15A N.C. Admin. Code 7H.0309(b). For CAMA permits, the local coastal governments are the initial decisionmakers, and applicants can seek a variance from the Commission if their initial permit is denied. See Compl. at ¶ 25.

The Zitos' property falls within the AEC. See id. at ¶ 29. The AEC official erosion rate is 6 feet per year, which, when multiplied by 30 as required by CAMA, results in a standard setback line of 180 feet from the first line of stable vegetation. See id.; 15A N.C. Admin. Code 7H.0306(5)(a). On April 26, 2018, the Town of Nags Head LPO denied the Zitos' CAMA Minor Permit. See Compl. ¶ 32; Ex. C [D.E. 1-4]. The LPO did so because the "[the Zitos'] home is setback approximately 12 ft. landward of the static vegetation line," and thus did not meet CAMA's requirements. See Compl. ¶ 32; Ex. C [D.E. 1-4] 3.

After the denial, the Zitos filed a variance petition with the Commission. See Compl. ¶¶ 25, 34. On November 27, 2018, the Commission considered the variance petition at a public hearing. See id. at ¶ 35. On December 27, 2018, the Commission denied the variance and issued a "Final Agency Decision." See id. at ¶ 36; Ex. D [D.E. 1-5]. In its "Final Agency Decision," the Commission concluded that the Zitos failed to demonstrate the requisite hardship to qualify for a

3

variance. See Compl. ¶ 37; Ex. D [D.E. 1-5] 11–16. On March 6, 2019, the Zitos filed this action and sought declaratory relief, just compensation, reasonable attorney fees and costs, and all other appropriate relief.

On May 9, 2019, the Commission moved to dismiss the complaint, asserting three grounds for dismissal: (1) under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject-matter jurisdiction; (2) under the Eleventh Amendment's grant of sovereign immunity; and (3) under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim [D.E 13, 14]. On June 5, 2019, the Zitos responded in opposition, and waived the state law inverse condemnation takings claim in count one of their complaint [D.E. 16]. On June 19, 2019, the Commission replied [D.E. 17].

On June 21, 2019, the Supreme Court decided Knick v. Township of Scott, 139 S. Ct. 2162 (2019). In Knick, the Court overruled Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City, 473 U.S. 172 (1985), a case that had formed a core part of the Commission's motion to dismiss. See Knick, 139 S. Ct. at 2167–68; [D.E. 14] 9–17. In Knick, the Court removed Williamson County's state-litigation requirement and held that a "property owner has suffered a violation of his Fifth Amendment rights when the government takes his property without just compensation, and therefore may bring his claim in federal court under [section] 1983 at that time." Knick, 139 S. Ct. at 2168. On June 26, 2019, this court denied the Commission's motion to dismiss and motion for leave to file a supplemental memorandum in light of Knick [D.E. 19]. See [D.E. 20, 21]. On July 10, 2019, the Commission answered the complaint [D.E. 22], and on August 20, 2019, amended its answer [D.E. 39].

On August 20, 2019, the Commission moved, for a second time, to dismiss for lack of jurisdiction [D.E. 36] and filed a supporting memorandum with three arguments [D.E. 38]. First,

the Eleventh Amendment bars the Zitos from asserting their federal takings claim in federal court since they could have brought a takings claim in state court. See [D.E. 38] 7–10; Hutto, 773 F.3d at 552. Second, and relatedly, the Eleventh Amendment provides the Commission Eleventh Amendment immunity in federal court because it is an "arm of the state." See [D.E. 38] at 10–20. Third, Congress has not abrogated the Commission's Eleventh Amendment immunity, and the Commission has not waived it. See id. at 21–24.

On September 6, 2019, the Zitos responded in opposition [D.E. 42]. They argued that the Fifth Amendment's Just Compensation Clause is self-executing, that it is binding on the states through the Fourteenth Amendment, and that the Eleventh Amendment does not bar claims against states under the Just Compensation Clause in federal court. See id. at 7–10. The Zitos also argued that, even if the Just Compensation Clause is not self-executing, they cannot bring a takings claim in North Carolina state court and thus the Eleventh Amendment should not apply. See id. at 12–16. On September 20, 2019, the Commission replied and argued that Hutto remains binding precedent, that North Carolina state courts remain open for the Zitos to assert their takings claim, and that the court should not accept wholesale the Zitos' statement of facts concerning the administrative and statutory scheme. See [D.E. 44].

II.

A.

The Fifth Amendment Takings Clause applies to the States through the Fourteenth Amendment. See, e.g., Murr v. Wisconsin, 137 S. Ct. 1933, 1942 (2017); Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 536 (2005). It provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. This prohibition "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice,

should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960). It applies to temporary government actions as well as permanent ones. See Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 322 (2002); First English Evangelical Lutheran Church v. Cty. of Los Angeles, 482 U.S. 304, 318–19 (1987); Front Royal & Warren Cty. Indus. Park Corp. v. Town of Front Royal, 135 F.3d 275, 285 (4th Cir. 1998).

"The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." Lingle, 544 U.S. at 537. For example, when the government uses its eminent domain power to condemn a person's land for some public purpose (such as to build a road or a military base), the government has "taken" that land and must pay just compensation for it. See, e.g., Ark. Game & Fish Comm'n v. United States, 568 U.S. 23, 31–32 (2012); Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 560 U.S. 702, 713–15 (2010); Lingle, 544 U.S. at 537; Tahoe–Sierra, 535 U.S. at 321–22.

A taking also occurs when instead of appropriating or invading private property, the government undertakes "regulatory actions that are functionally equivalent to the classic taking." Lingle, 544 U.S. at 539; see Murr, 137 S. Ct. at 1942–43; Horne v. Dep't of Agric., 135 S. Ct. 2419, 2427 (2015). "[N]o magic formula enables a court to judge, in every case, whether a given government interference with property is a taking." Ark. Game & Fish Comm'n, 568 U.S. at 31; see Stop the Beach Renourishment, Inc., 560 U.S. at 713. Nonetheless, the Supreme Court has identified two situations in which a regulation will, per se, constitute a taking. First, a regulation is a taking if it authorizes a "permanent physical occupation" of property. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426 (1982); see, e.g., Ark. Game & Fish Comm'n, 568 U.S. at 32. Second, a regulation is a taking if it requires a property owner to sacrifice all economically beneficial use of the property, unless the regulation does no more than enforce limits that "inhere in the title

6

itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1029 (1992).[2]

Regulations that fit neither per se rule are evaluated using the multi-factor balancing test in Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978). See Horne, 135 S. Ct. at 2427; Ark. Game & Fish Comm'n, 568 U.S. at 31–32; Lingle, 544 U.S. at 538–39. The so-called "Penn Central factors" include (1) the regulation's economic impact on the claimant, (2) the extent to which the regulation interferes with the claimant's reasonable, investment-backed expectations, and (3) the character of the government's action. See Murr, 137 S. Ct. at 1943; Lingle, 544 U.S. at 538–39; Penn Cent., 438 U.S. at 124. A regulatory taking (just like a "classic taking") can be either permanent or temporary. See Tahoe–Sierra, 535 U.S. at 322–23; Lucas, 505 U.S. at 1030 & n.17; First English, 482 U.S. at 318–19; Sansotta v. Town of Nags Head, 97 F. Supp. 3d 713, 729–30 (E.D.N.C. 2014).

## B.

The Eleventh Amendment states, in full: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Eleventh Amendment provides states with "immuni[ity] from suits brought in federal courts by her own citizens as well as by citizens of another state," a concept known as sovereign immunity. Edelman v. Jordan, 415 U.S. 651, 663 (1974). Historically, the "Fourth Circuit has 'been unclear on whether a dismissal on Eleventh Amendment immunity grounds is a dismissal for failure to state a claim under Rule 12(b)(6) or a dismissal for lack of subject-matter jurisdiction

---

[2] This principle also applies under the North Carolina Constitution. See, e.g., Helms v. City of Charlotte, 255 N.C. 647, 655–57, 122 S.E.2d 817, 824–25 (1961).

under Rule 12(b)(1).'" Kariuki v. Dep't of Ins., No. 5:18-CV-341-D, 2019 WL 2559807, at *3 (E.D.N.C. June 20, 2019) (unpublished) (quoting Andrews v. Daw, 201 F.3d 521, 524 n.2 (4th Cir. 2000)), appeal dismissed, 2020 WL 1062217 (4th Cir. Mar. 5, 2020) (per curiam) (unpublished). But the Fourth Circuit recently held that "sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction." Cunningham v. Gen. Dynamics Info. Tech., Inc., 888 F.3d 640, 649 (4th Cir. 2018) (quotation omitted); see Ackerson v. Bean Dredging LLC, 589 F.3d 196, 207 (5th Cir. 2009); Hill v. CBAC Gaming LLC, No. DKC 19-0695, 2019 WL 6729392, at *4 (D. Md. Dec. 11, 2019) (unpublished). Accordingly, the court analyzes the Commission's assertion of Eleventh Amendment sovereign immunity under Rule 12(b)(1).

A Rule 12(b)(1) motion to dismiss for sovereign immunity under the Eleventh Amendment tests subject-matter jurisdiction, which is the court's "statutory or constitutional power to adjudicate the case." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998) (emphasis omitted). A federal court "must determine that it has subject-matter jurisdiction over [a claim] before it can pass on the merits of that [claim]." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 479–80 (4th Cir. 2005). In considering a motion to dismiss for lack of subject-matter jurisdiction, the court may consider evidence outside the pleadings without converting the motion into one for summary judgment. See Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999). Although plaintiffs bear the burden of establishing that this court has subject-matter jurisdiction over their claims, see, e.g., Steel Co., 523 U.S. at 104; Evans, 166 F.3d at 647; Richmond, Fredericksburg & Potomac R.R. v. United States, 945 F.2d 765, 768 (4th Cir. 1991), the party asserting sovereign immunity bears the burden of demonstrating that immunity. See Hutto, 773 F.3d at 543 (collecting cases).

In Hutto, the Fourth Circuit held that "the Eleventh Amendment bars Fifth Amendment taking claims against States in federal court where the State's courts remain open to adjudicate such claims." Hutto, 773 F.3d at 552 (emphasis omitted). Thus, to dismiss a Fifth Amendment takings claim, Hutto requires: (1) an entity to enjoy sovereign immunity under the Eleventh Amendment and (2) the state to provide an open forum to adjudicate such a takings claim. See id. at 551–52.

The Zitos argue that the Eleventh Amendment offers states, and their related entities, no protection against a Fifth Amendment takings claim in federal court. See [D.E. 42] 7–11. Specifically, the Zitos contend that given "the automatically-effective nature of the damages remedy in the Just Compensation Clause, the imposition of that Clause on the states through the Fourteenth Amendment was the sole congressional action needed to open states to takings claims seeking damages." [D.E. 42] 10–11. In order to distinguish Hutto and to support their argument, the Zitos cite footnote 9 in First English, 482 U.S. at 316 n.9. The Zitos then contend: (1) "the Hutto panel was not presented with the full, Fourteenth Amendment-based argument against sovereign immunity"; and (2) the Hutto panel did not "consider the Supreme Court's decision in First English." [D.E. 42] 11.

This court cannot ignore binding Fourth Circuit precedent, even if the Zitos offer a persuasive rationale to consider doing so. Just as a court of appeals cannot overrule the Supreme Court, a district court cannot overrule a court of appeals. See Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989) ("If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."). Hutto controls the disposition of this case, and this court must follow it until either the Fourth Circuit sitting en banc or the Supreme Court instructs otherwise. See

9

Agostini v. Felton, 521 U.S. 203, 237–38 (1997); United States v. Sterling, 724 F.3d 482, 501–02 (4th Cir. 2013); Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27, 728 F.3d 354, 363 (4th Cir. 2013); United States v. Logan, No. 5:08-CR-20-D, 2008 WL 11422532, at *7 (E.D.N.C. Sept. 4, 2008) (unpublished), aff'd in part, vacated in part, 395 F. App'x 38 (4th Cir. 2010) (per curiam) (unpublished); Brown v. N. C. Div. of Motor Vehicles, 987 F. Supp. 451, 458 (E.D.N.C. 1997), aff'd, 166 F.3d 698 (4th Cir. 1999).

Alternatively, the Zitos underrate Hutto's analysis and overrate the strength of footnote nine in First English. As for Hutto, the Fourth Circuit provided a tight analogy from Supreme Court precedent to support its holding. See Hutto, 773 F.3d at 551–52. Just as states can invoke sovereign immunity for tax disputes in federal court so long as a state forum remains open, so too states can invoke sovereign immunity for takings claims in federal court so long as a state forum remains open. See id.; Reich v. Collins, 513 U.S. 106, 110 (1994) ("[T]he sovereign immunity [that] states enjoy in federal court, under the Eleventh Amendment, does generally bar tax refund claims from being brought in that forum," but state courts must hear suits to recover taxes unlawfully extracted in violation of federal law notwithstanding the "sovereign immunity [that] [s]tates traditionally enjoy in their own courts.");[3] cf. Alden v. Maine, 527 U.S. 706, 740 (1999) (holding that Congress, under

---

[3] In Reich, plaintiff was a retired federal military officer who sued Georgia in Georgia state court seeking a refund of taxes that Georgia imposed on plaintiff's federal retirement benefits. See Reich, 513 U.S. at 108. The Georgia tax scheme violated the intergovernmental tax immunity doctrine dating back to McCulloch v. Maryland, 4 Wheat. 316 (1819), and generally codified at 4 U.S.C. § 111. See Reich, 513 U.S. at 108. The Georgia Supreme Court refused to permit plaintiff to obtain a refund in state court. See id. at 109–12. The United States Supreme Court held that "a denial by a state court of a recovery of taxes exacted in violation of the laws or Constitution of the United States by compulsion is itself in contravention [of the Due Process Clause] of the Fourteenth Amendment." Id. at 109 (quotation omitted). Thus, plaintiff could seek relief in Georgia state court for taxes that Georgia improperly imposed on his federal retirement benefits in violation of federal law. See id. at 108–112.

Article I of the Constitution, cannot subject nonconsenting states to private suits for damages in state courts for allegedly violating federal law, but declining to overrule Reich because the obligation in Reich "arises from the Constitution itself"). Moreover, the Fourth Circuit in Hutto discussed two cases that rejected the Zitos' proposed resolution between the self-executing Just Compensation Clause in the Fifth Amendment and sovereign immunity in federal court in the Eleventh Amendment. See Hutto, 773 F.3d at 553; Seven Up Pete Venture v. Schweitzer, 523 F.3d 948, 954 (9th Cir. 2008) ("[W]e conclude that the constitutionally grounded self-executing nature of the Takings Clause does not alter the conventional application of the Eleventh Amendment"); DLX, Inc. v. Kentucky, 381 F.3d 511, 526 (6th Cir. 2004) ("Treating DLX's claim as a self-executing reverse condemnation claim, . . . we conclude that the Eleventh Amendment's grant of immunity protects Kentucky from that claim . . . .").

As for footnote nine in First English, footnote nine cannot bear the weight that the Zitos place on it. See First English, 482 U.S. at 316 n.9. First, footnote nine is dicta in that the Court was responding not to a principal argument of the parties, but rather to the United States' amicus brief. See id. Second, footnote nine was not essential to deciding First English. See id. Indeed, First English did not concern the Eleventh Amendment or even mention it. Rather, in First English, the Supreme Court reversed the California First District Court of Appeal and held that a landowner who claimed that his property has been "taken" in violation of the Fifth and Fourteenth Amendments by a "land-use regulation may [] recover damages for the time before it is finally determined that the regulation constitutes a 'taking' of his property." Id. at 306–07. In addition, the Hutto panel analyzed Seven Up and DLX to explain the significance of a state-court remedy to the Eleventh Amendment's self-executing nature and discussed Reich and Alden to support its holding. See Hutto, 773 F.3d at 551–53; Seven Up, 523 F.3d 954–956; DLX, 381 F.3d at 526–28. Although the

11

_Hutto_ panel did not cite _First English,_ the _Hutto_ panel grappled with the issues that footnote nine in

_First English_ presented. Accordingly, the court rejects the Zitos' argument.

## III.

### A.

Because the Commission is asserting sovereign immunity, it bears the burden of proving such

immunity. See _Hutto,_ 773 F.3d at 542–43. The Eleventh Amendment protects not only states, but

also "'state agents and state instrumentalities,' or in other words, arms of the state." _Lane v._

_Anderson,_ 660 F. App'x 185, 195 (4th Cir. 2016) (per curiam) (unpublished) (quoting _Regents of_

_the Univ. of Cal. v. Doe,_ 519 U.S. 425, 429 (1997)). "The purpose of the arm-of-state inquiry is to

distinguish arms or alter egos of the state from mere political subdivisions of [the] State such as

counties or municipalities, which, though created by the state, operate independently and do not

share the state's immunity." _U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency,_ 804 F.3d

646, 651 (4th Cir. 2015) (alteration in original) (quotation omitted); see _Kitchen v. Upshaw,_ 286

F.3d 179, 184 (4th Cir. 2002). To determine whether a state-created entity is an "arm of the state,"

the court considers four, non-exclusive factors:

> (1) whether any judgment against the entity as defendant will be paid by the State or
> whether any recovery by the entity as plaintiff will inure to the benefit of the State;
>
> (2) the degree of autonomy exercised by the entity, including such circumstances as
> who appoints the entity's directors or officers, who funds the entity, and whether the
> State retains a veto over the entity's actions;
>
> (3) whether the entity is involved with state concerns as distinct from non-state
> concerns, including local concerns; and
>
> (4) how the entity is treated under state law, such as whether the entity's relationship
> with the State is sufficiently close to make the entity an arm of the State.

_S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc.,_ 535 F.3d 300, 303 (4th Cir.

2008) (quotation and alteration omitted); see Lane, 660 F. App'x at 195; Oberg, 804 F.3d at 650–51; Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n, 822 F.2d 456, 457–58 (4th Cir. 1987). Although each factor is significant, the most important, but not dispositive, factor "is whether the state treasury will be responsible for paying any judgement that might be awarded." Hutto, 773 F.3d at 543 (quotation omitted); see Lane, 660 F. App'x at 195; United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131, 137 n.4 (4th Cir. 2014); Ram Ditta, 822 F.2d at 457. When factors conflict, the twin reasons for the Eleventh Amendment—protecting state treasuries and respecting state sovereign dignity—must guide the analysis. See Oberg, 804 F.3d at 676; Gray v. Laws, 51 F.3d 426, 432 (4th Cir. 1995). At bottom, the court must "determine whether the governmental entity is so connected to the State that the legal action against the entity would . . . amount to 'the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" Cash v. Granville Cty. Bd. of Educ., 242 F.3d 219, 224 (4th Cir. 2001) (quoting Seminole Tribe v. Florida, 517 U.S. 44, 58 (1996)).

As for the first factor concerning responsibility for judgments, the finances of the Commission and North Carolina are intertwined. The Commission, along with the DCM and larger CAMA programs, "receive[s] funding from the North Carolina General Assembly ("NCGA"), federal grants and appropriations, and permit revenue," which become state funds when deposited in State Treasury accounts. Davis Dec. [D.E. 14-2] ¶ 10; see N.C. Gen. Stat. § 143C-1-1(d)(25). Ultimately, the Commission's budget is part of the Governor's budget, and not independent of the state. See Davis Dec. at ¶ 11; N.C. Gen. Stat. §§ 143C-3-3(a), 3-5(a), and 5-4(b). The Commission does not administer its own accounts. Rather, the state does. See N.C. Gen. Stat. § 147-77. Likewise, the Commission does not "own any property or have any resources apart from the state with which to pay a judgment." Davis Dec. at ¶ 12. Moreover, with any judgment serving as an

"unbudgeted expense" for the Commission, the state would feel the effect directly through its Treasury because "the State is the Commission's exchequer." [D.E. 38] 12; see Davis Dec. at ¶ 13. Although the state is not explicitly liable for the Commission's liability, the state is functionally liable for any judgment. See Oberg, 804 F.3d at 658 ("A state may also be functionally liable if the funds available to pay any judgment effectively belong to the state rather than the agency."). Thus, the first factor strongly favors the Commission.

As for the second factor concerning autonomy, the Commission is not autonomous. In analyzing autonomy, the court considers "the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions." Oberg, 804 F.3d at 668 (quotation omitted). Both the appointment and funding considerations reveal that the Commission lacks autonomy. Either the Governor or the NCGA appoints its directors, see N.C. Gen. Stat. §§113A-104(b1) and 104(i), and the NCGA funds the Commission as part of the Governor's budget. See N.C. Gen. Stat. §§ 143C-3-3(a), 3-5(a), and 5-4(b). Although the Governor and the NCGA lack an explicit veto over the Commission's actions, the Attorney General of North Carolina serves as the Commission's attorney and approves use of private counsel and any settlement over $75,000. See N.C. Gen. Stat. §§ 113A-124(d), 114-2.3, and 114-2.4.

As for the third factor concerning statewide concern, the Commission regulates the coastal areas of North Carolina and thereby affects areas of state-wide importance. See Adams v. N.C. Dep't of Nat. & Econ. Res., 295 N.C. 683, 691–93, 249 S.E.2d 402, 407–08 (1978); Oberg, 804 F.3d at 674. As for the fourth factor concerning the entity's treatment under state law, North Carolina treats the Commission as if it were part of the state in several ways. For example, the NCGA created the Commission. See N.C. Gen. Stat. § 113A-104. Good governance laws such as the State

14

Government Ethics Act apply to the Commission. See N.C. Gen. Stat. § 113A-104(c2). North Carolina's Administrative Procedure Act applies to the Commission. See N.C. Gen. Stat. §§ 113A-121.1(a), 150B-2(1a). Thus, all four factors weigh in favor of granting the Commission sovereign immunity.

Because the Commission has proven that it is an arm of the state and has sovereign immunity under the Eleventh Amendment, the burden shifts to the Zitos to prove that the Commission has waived its sovereign immunity, or that the Commission's sovereign immunity has been abrogated. See Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019) ("Once a defendant has [proven that it is an arm of the state], the burden to prove that immunity has been abrogated or waived would then fall to the plaintiff."). As for waiver, the Zitos have alleged no facts to demonstrate that the Commission has clearly and unequivocally waived immunity to a federal takings claims in federal court. See, e.g., Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 305–06 (1990); Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241 (1985), superseded by statute, 42 U.S.C. § 2000d–7; Pennhurst State Sch. & Hosp v. Halderman, 465 U.S. 89, 99 (1984); Pense v. Md. Dep't of Pub. Safety & Corr. Servs., 926 F.3d 97, 101 (4th Cir. 2019). As for abrogation, the Zitos argue that the self-executing nature of the Fifth Amendment means that Congress need not provide statutory abrogation—the Fourteenth Amendment already did so itself. See [D.E. 42] 10–11; cf. Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 73 (2000) ("To determine whether a federal statute properly subjects States to suits by individuals, we apply a simple but stringent test: Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.") (quotation omitted). However, Hutto forecloses this argument. See Hutto, 773 F.3d at 551–552. Accordingly, the Commission has not waived its sovereign immunity, and it has not been abrogated.

## B.

North Carolina also provides a forum to adjudicate the Zitos' takings claim. Under Hutto, a state court must remain available to hear a takings claim in order for a state to enjoy sovereign immunity in federal court. See Hutto, 773 F.3d at 551–552. Here, the Zitos can seek relief under both the state statutory scheme and the North Carolina Constitution. As for the state statutory scheme, N.C. Gen. Stat. § 113A-123 grants the ability to challenge Commission actions in state court, setting numerous procedural requirements that include venue, statute of limitations, and a jury-trial right, among others. See N.C. Gen. Stat. § 113A-123(b). If a state court finds a taking, the Commission may petition the Department of Administration to begin eminent domain proceedings. See N.C. Gen. Stat. § 113A-123(c). Under N.C. Gen. Stat. § 113A-123, the state compensates a property owner only as part of the eminent domain proceedings that can be triggered after a court invalidates a taking. Cf. id.; see N.C. Gen. Stat. §§ 146-24(c), 136-103(b)(5). That statute also provides that "[t]he method provided in this subsection for the determination of the issue of whether such order constitutes a taking without compensation shall be exclusive and such issue shall not be determined in any other proceeding." N.C. Gen. Stat. § 113A-123(b) (emphasis added).

The Zitos construe the eminent domain and exclusivity portions of N.C. Gen. Stat. § 113A-123 to mean that North Carolina is not open to their state takings claim. See [D.E. 42] 12–16. According to the Zitos, N.C. Gen. Stat. § 113A-123 only invalidates regulatory actions by the Commission, making the taking temporary until eminent domain proceedings occur. Cf. First English, 482 U.S. at 319 ("Invalidation of the ordinance or its successor ordinance after this period of time, though converting the taking into a 'temporary' one, is not a sufficient remedy to meet the demands of the Just Compensation Clause."). Section 113A-123(c) does provide monetary compensation once such eminent domain proceedings have run their course; however, the Zitos

argue that they require monetary compensation in the meantime for the denial of the permit that resulted in a temporary loss of value of their property. See [D.E. 42] 14–15. Coupling the temporary-taking gap in the broader statutory scheme with the "exclusive" nature of the N.C. Gen. Stat. § 113A-123(b), the Zitos assert that North Carlina state courts are closed to claims such as the one at issue here.

The court rejects the Zitos' argument. The Zitos misconstrue the term "exclusive" in N.C. Gen. Stat. § 113A-123(b) and ignore that a plaintiff can recover monetary compensation in state court under the North Carolina Constitution for a temporary taking. As for exclusivity, the "exclusive" in N.C. Gen. Stat. § 113A-123(b) applies to "whether such order constitutes a taking without compensation," meaning that the procedure that the statutory scheme describes shall be exclusive. N.C. Gen. Stat. § 113A-123(b) (emphasis added). Moreover, that procedure is the "method provided in this subsection for the determination of the issue," which includes "a jury trial on all issues of fact" and other procedural provisions. Id. Thus, the procedural method outlined in N.C. Gen. Stat. § 113A-123(a) and (b) is exclusive for determining whether a taking occurred. See Weeks v. N.C. Dep't of Nat. Res. & Cmty. Dev., 97 N.C. App. 215, 223, 388 S.E.2d 228, 233 (1990) ("[T]he statute's 'method' contemplates both legal and factual determinations only of whether a 'taking' occurred."). However, N.C. Gen. Stat. § 113A-123(b) does not require that the remedies provided by the statutory scheme, invalidation of a taking and monetary compensation as part of eminent domain proceedings, are exclusive. See N.C. Gen. Stat. § 113A-123(b).

As for other remedies, although the Zitos correctly note that N.C. Gen. Stat. § 113A-123(b) does not provide a monetary remedy for temporary takings during the eminent domain procedure, the North Carolina Constitution provides such a remedy. Notably, the North Carolina Constitution does not expressly prohibit governments from taking private property for public use without just

17

compensation, but the Supreme Court of North Carolina has found such a prohibition in the Law of the Land Clause. See, e.g., Finch v. City of Durham, 325 N.C. 352, 362–63, 384 S.E.2d 8, 14 (1989). The Supreme Court of North Carolina uses the same standard for determining whether a government took property in violation of the North Carolina Constitution as the Supreme Court of the United States uses to assess a Fifth Amendment takings claim. See, e.g., id. at 371–72, 384 S.E.2d at 19; N.C. Dep't of Transp. v. Cromartie, 214 N.C. App. 307, 314–15, 716 S.E.2d 361, 367 (2011); Adams Outdoor Advert. v. N.C. Dep't of Transp., 112 N.C. App. 120, 122, 434 S.E.2d 666, 667 (1993). Thus, the Zitos can sue under the Law of the Land Clause of the North Carolina Constitution, which states in relevant part: "No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land." N.C. Const. art. I, § 19.

The Zitos' takings claim cannot be remedied fully under N.C. Gen. Stat. § 113A-123 because the eminent domain procedures fail to compensate for the temporary loss in value during the duration of the proceedings. The Supreme Court of North Carolina, however, has recognized "inverse-condemnation" claims, similar to the regulatory taking at issue here, as allowing for damages. See Finch, 325 N.C. at 362–63, 384 S.E.2d. at 14; Long v. City of Charlotte, 306 N.C. 187, 195–96, 293 S.E.2d 101, 107–08 (1982), superseded on other grounds by statute, Act of July 10, 1981, ch. 919, sec. 28, 1981 N.C. Sess. Laws 1382, 1402; see also Kirby v. N.C. Dep't of Transp., 368 N.C. 847, 855–56, 786 S.E.2d 919, 925–26 (2016). Moreover, North Carolina courts have allowed "vested rights claims," which are "rooted in the due process of law and the law of the land clauses of the federal and state constitutions," to proceed as claims under the North Carolina Constitution in the context of zoning claims. Godfrey v. Zoning Bd. of Adjustment, 317 N.C. 51, 62, 344 S.E.2d 272, 279 (1986) (quotation omitted) (emphasis added); see Swan Beach Corolla, L.L.C. v. Cty. of

18

Currituck, 244 N.C. App. 545, 781 S.E.2d 350, 2015 WL 8747777, at *3–4 (2015) (unpublished table opinion). Thus, North Carolina provides a forum to adjudicate the Zitos' takings claim.

## C.

This case raises two significant issues concerning the effect of Hutto. First, Hutto's state-court remedy requirement is in tension with the Supreme Court's reasoning in Knick. Second, Hutto concerned a federal takings claim in federal court, but did not mention litigating a federal takings claim in state court. As for Hutto's tension with Knick, the Court in Knick removed the state-litigation requirement that had forced litigants to file their takings claims under state law in state court before pursuing a takings claim in federal court. See Knick, 139 S Ct. at 2167–68. Hutto, however, still forces litigants who wish to pursue a takings claim under the Fifth Amendment into state courts. See Hutto, 773 F.3d at 551–52.

Of course, the Court in Knick did not consider sovereign immunity under the Eleventh Amendment because Knick involved a suit between a private property owner and a locality that was not entitled to sovereign immunity under the Eleventh Amendment. See Knick, 139 S. Ct. at 2167–71; Bay Point Properties, Inc. v. Miss. Transp. Comm'n, 937 F.3d 454, 456–57 (5th Cir.), petition for cert. filed, No. 19-798 (2019); Williams v. Utah Dep't of Corr., 928 F.3d 1209, 1214 (10th Cir. 2019). But in reiterating the self-executing nature of the Just Compensation Clause, the Court in Knick foreshadows the day when the Court will have to address the interplay between the Fifth Amendment's Just Compensation Clause and the Eleventh Amendment. Cf. Knick, 139 S. Ct. at 2171; Lumbard v. City of Ann Arbor, 913 F.3d 585, 591 (6th Cir.) (Kethledge, J., concurring) ("But the Takings Clause does not say that private property shall not 'be taken for public use, without just compensation, and without remedy in state court.' Instead the Clause says that private property shall not 'be taken for public use, without just compensation' period."), cert. denied, 140

19

S. Ct. 267 (2019). Although Hutto binds this court, the court recognizes the force of the Zitos'

arguments, notes the significant constitutional issues that the Zitos raise, and acknowledges that "the

guarantee of a federal forum rings hollow for takings plaintiffs, who are forced to litigate their claims

in state court." Knick, 139 S. Ct. at 2167.

As for litigating a federal takings claim in state court, Hutto does not foreclose a state forum

for a federal takings claim. See Hutto, 773 F.3d at 552 ("[W]e conclude that the Eleventh

Amendment bars Fifth Amendment taking claims against States in federal court when the State's

courts remain open to adjudicate such claims." (emphasis omitted)). State courts can hear federal

constitutional claims just like federal courts. See, e.g., Yellow Freight Sys., Inc. v. Donnelly, 494

U.S. 820, 823 (1990); Tafflin v. Levitt, 493 U.S. 455, 458–59 (1990); Gulf Offshore Co. v. Mobil

Oil Corp., 453 U.S. 473, 477–78 (1981). Whether the Commission successfully can invoke

sovereign immunity for a federal takings claim in state court is a different question for a different

court on a different day. Cf. Howlett v. Rose, 496 U.S. 356, 367–81 (1990) (holding that a state

court cannot use state law sovereign immunity to decline jurisdiction over an action for money

damages under 42 U.S.C. § 1983, where state courts entertained similar state-law actions against

state defendants); Will v. Mich. Dept. of State Police, 491 U.S. 58, 65–66 (1989) (holding that a

State is not a "person" against whom a claim for money damages under 42 U.S.C. § 1983 can be

asserted); Long, 306 N.C. at 203, 293 S.E.2d at 111–12; Beroth Oil Co. v. N.C. Dep't of Transp.,

220 N.C. App. 419, 432–33, 725 S.E.2d 651, 660–61 (2012), aff'd in part, vacated in part, 367 N.C.

333, 757 S.E.2d 466 (2014). Nonetheless, this court dismisses the Zitos' complaint without

prejudice, and this dismissal does not affect the Zitos' ability to assert a takings claim in state court

directly under the Fifth and Fourteenth Amendments[4] or under 42 U.S.C. § 1983.[5]

## IV.

In sum, the court GRANTS the Commission's motion to dismiss [D.E. 36] and DISMISSES the complaint WITHOUT PREJUDICE for lack of subject-matter jurisdiction. The court DENIES as moot the Federation's motion to intervene [D.E. 24] and the Zitos' motion to clarify the stipulated administrative facts [D.E. 46].

SO ORDERED. This 2.7 day of March 2020.

JAMES C. DEVER III
United States District Judge

---

[4] See First English, 482 U.S. at 316 n.9; Lawyer v. Hilton Head Pub. Servs. Dist. No. 1, 220 F.3d 298, 302 n.4 (4th Cir. 2000); Mann v. Haigh, 120 F.3d 34, 37 (4th Cir. 1997); Sansotta, 97 F. Supp. 3d at 728 n.4.

[5] See City of Monterey v. Del. Monte Dunes at Monterey, Ltd., 526 U.S. 687, 709–22 (1999); Sansotta, 97 F. Supp. 3d at 728 n.4.